ENGINEER CO. v. HOTEL ASTOR et al.

(District Court, S. D. New York. October 17, 1914.)

No. 5-203.

1. PATENTS ⬤→328—VALIDITY AND INFRINGEMENT—FURNACE REGULATING DE-
VICE.

The McLean patents, No. 817,438, for mechanism, and No. 826,349, for
a method for regulating furnaces to secure a "balanced draft" by which
the blower and flue damper are automatically and reciprocally controlled
by means of the steam from the boiler, with the object of maintaining sub-
stantially atmospheric pressure in the furnace chamber, was not an-
ticipated, and discloses invention; also *held* infringed.

2. PATENTS ⬤→46—VALIDITY—"OPERATIVENESS" OF DEVICE.

A patented device need not be perfect in order to escape the charge of
inoperativeness, but the test of "operativeness" is to ascertain whether
it does perform the acts claimed for it in the method described and for
the reasons given.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 54, 55; Dec.
Dig. ⬤→46.]

3. PATENTS ⬤→176—CONSTRUCTION OF CLAIMS—FURNACE REGULATING DEVICE
—"SUBSTANTIALLY."

In a patent claim for regulating furnaces so as to maintain in the
furnace chamber a "substantially atmospheric pressure" the word "sub-
stantially" means so near to atmospheric pressure as to produce and
maintain the economies and superiorities sought after,

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 250⅔–252; Dec.
Dig. ⬤→176.

For other definitions, see Words and Phrases, First and Second Series,
Substantially.]

4. PATENTS ⬤→176—CONSTRUCTION OF CLAIMS—FURNACE REGULATING DEVICE
—"BALANCED DRAFT."

In a patent claim for regulating furnace, the term "balanced draft"
means that the plus, or over-atmospheric pressure in the ash pit is exactly
equal to the minus pressure or partial vacuum in the flue.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 250⅔–252; Dec.
Dig. ⬤→176.]

In Equity. Suit by the Engineer Company against the Hotel Astor,
William C. Muschenheim, its president, and William C. Muschenheim,
individually, for infringement of letters patent Nos. 817,438 and 826,-
349, for mechanism and method for regulating furnaces, granted to
Embury McLean. On final hearing. Decree for complainant.

George E. Cruse and J. Edgar Bull, both of New York City, for
complainant.

Clarence G. Campbell and Stephen J. Cox, both of New York City,
for defendants.

HOUGH, District Judge. [1] The patents in suit, considered to-
gether, embody certain ideas of Mr. McLean concerning the regula-
tion of furnaces. The earlier patent claims a combination and the
later a method, but both reveal the same thing as the fruit of the paten-
tee's efforts.

⬤→For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The sixth claim of No. 817,438 may be thus analyzed:

"In combination with a furnace, a blower, means for varying the supply of air to the furnace from said blower in quantities graduated between the extremes (this signifies that the patentee regulates his blower according to and by means of the pressure of steam in the boiler); means for varying the escape of gases from the furnace in quantities graduated between the extremes (this refers to a damper in the chimney flue capable of adjustment in positions varying from open to shut); and substantially corresponding to the graduated quantities of air supplied to the furnace by the blower (this means that the operation of the blower and flue damper must be made to correspond with each other, i. e., the faster the blower goes the more the damper opens, and e converso); the parts being automatically controlled (the control is by means of the boiler pressure) and so proportioned that a substantially atmospheric pressure is maintained in the furnace."

The second claim of the method patent (No. 826,349) is illustrative, viz.:

"The method of regulating furnaces which consists in maintaining in the furnace chamber a pressure substantially equal to atmospheric pressure under varying rates of combustion."

It is thus seen that the object sought by the patentee is the maintenance in the furnace chamber of "substantially atmospheric pressure," and that the combination which produces the result and the method of its production amount to a device by which as boiler pressure diminishes or increases the blower speeds up or slows down; if the blower slows, the flue damper correspondingly closes; if the blower speeds, the damper correspondingly opens. How much the damper shall move when the blower slows or hastens is empirically determined when the apparatus is put in place by observing the combustion chamber pressure under varying conditions of fire and air; but when the quantum of movement is determined—

"the power productive of motion is always the steam in the boiler, operating through machinery unnecessary to describe, directly on blower and flue damper."

To maintain "substantially atmospheric pressure" in the combustion chamber of a furnace (i. e., immediately above the fire bed) cannot be a desirable end—in and of itself. It must be indicative of more important things. The fact is that when the pressure is atmospheric, or substantially so, immediately above the furnace fire bed, there is no great suction of cold air into the furnace when the door is opened; nor, on the other hand, does a tongue of flame lick out into the fire-room when opportunity offers. If the cold air does not enter above the fire bed, nor the flame shoot out, it is evidence that combustion is progressing with evenness, and the heated gases are progressing without undue speed through tubes and baffles toward the chimney exit where is situated the flue damper. Thus the maintenance of atmospheric pressure is merely a brief way of expressing the maintenance of favorable and economical conditions of combustion.

The real defendant in this case is the corporation which placed in the Hotel Astor the alleged infringing apparatus. That defendant cannot logically deny that the maintenance of atmospheric pressure is desirable because it claims to have produced the same thing or brought

about the same results in the apparatus complained of and installed by it in the defendant's hotel. (I think this is shown by the evidence of Mr. Canady.)

[3] Much discussion has occurred over the word "substantially," used in the claims and specifications of the patents. I find no difficulty in understanding what the patentee means. He wishes to avoid any appearance of professing ability to maintain exactly atmospheric pressure in the combustion chamber. He wishes also to produce certain economies and superiorities of which a pressure near that of the atmosphere and nearly constant is the sign or symbol. Therefore the word "substantially" as used in the patents means so near to atmospheric pressure as to produce and maintain the economies and superiorities sought after, and merely illustrated by the phrase "substantially atmospheric pressure."

It is, of course, denied that the Hotel Astor apparatus infringes. It is said in substance: (a) Defendant's device does not seek to achieve substantially constant (atmospheric) pressure; and (b) if that result is achieved it is not brought to pass by the same method.

The first denial is thus expressed in argument:

"The theoretically stated operation of the McLean device results in uniform pressure of gases in the combustion chamber while the proper operation of the Hotel Astor device results in continually varying pressures in the combustion chamber."

This is, I think, mere juggling with words. Owing to changes in local air conditions, to variations in the quality or quantity of fuel, and even to a higher pressure of wind at the chimney top, all furnace fires have a tendency toward varying pressures in the combustion chamber. It is perfectly true that if the pressure did not change in the combustion chamber McLean's apparatus would have nothing to do; neither would defendant's; but it is also true that both sedulously endeavor to prevent those changes and both (if they work) put into operation checks and corrections just as soon as pressure changes or varies.

The second statement of noninfringement amounts to saying that the combination of McLean is not used. As previously pointed out, McLean's device automatically operates both on blower and flue damper with a power directly derived from the steam pressure. In defendant's device the steam pressure operates directly on the flue damper only. According as that damper stops or passes more or less heated gases, the pressure of said gases rises or falls in the combustion chamber itself, and that pressure causes movement of a swinging blade or diaphragm which mechanically moves the ash-pit damper controlling the forced draught, i. e., the blower causes an adjustment corresponding to and graduated with that of the flue damper which was actuated direct from the steam chest.

It seems to me that if viewed merely as a matter of verbal construction, McLean's sixth claim (above set forth) reads directly on the Hotel Astor apparatus.

If viewed from a mechanical standpoint, I perceive no difference between actuating both blower and flue damper directly from the steam, and applying the power to the flue damper only, and letting it

pass on the power to blower or ash-pit damper. The distinction suggests that between throwing down two bricks by one hand movement, and toppling over one and letting it throw down the other.

[4] Invention is also denied. McLean has coined the phrase "balanced draft" to describe the mechanical conditions toward which he aims, and has measurably arrived by means of his patented apparatus. "Balanced draft" means that the plus or over-atmospheric pressure in the ash pit is exactly equal to the minus pressure or partial vacuum in the flue. The theoretical result of this condition is (assuming the resistance of fire bed to be just equal to that of tubes and baffles) to produce zero or atmospheric pressure in the combustion chamber.

There is of course no magic in the phrase "balanced draft," and it is true that inventors before McLean conceived the idea. It is also true that many inventors have sought to control some function of a furnace from or by means of the steam pressure. It is also true that McLean himself had sought to control both the draft below the fire bed and that above the baffles, by or from the steam pressure. But after considering especially Peck British patent 11,033 of 1893, Patterson and Burke 707,865, St. Peter 631,829 and Darrin and McLean 690,931, I am of opinion that no one before McLean sought to control directly or indirectly from the steam chest both draft below the fire bed and discharge above it, and to perform such regulation automatically, so that if the apparatus worked with theoretical perfection the pressure below the fire bed and the partial vacuum above would exactly balance each other. Peck had the idea, but his regulatory devices had to be set by hand, and in all the others worth considering and coming apparently nearer McLean's device there was no endeavor made to vary the flue damper except from fully open to completely shut.

It is not overlooked that defendants insist that McLean's flue damper will do no more than this. I am convinced that not only theoretically it must assume graduated positions corresponding to the activities of the blower, but that it does do it when the damper itself is mechanically well constructed.

[2] The larger portion of a very voluminous record is taken up with two variations of what is really the same thing, viz., that complainant's device is not operative. It is probably true that a hesitating Patent Office was greatly moved toward the issuance of these patents by a long list of installations furnished by McLean. Defendants have gone through these installations with care and hostility, and drawn from them two arguments: (a) It was a fraud on the Patent Office to furnish the list; and (b) it is a defense to the patent that the listed installations do not work.

I have sought to find these defenses in the answer contained in the record, but without success. Defendant's ability to make them rests largely on the fact that some of the officers and employés of the real defendant were formerly connected with the complainant. It is impossible to reconcile what they say about these plants with what McLean says about the same devices. In my judgment the scale is turned in favor of the complainant by the certificates given by customers and relating to many of the plants enumerated to the Patent Office.

A device need not be perfect in order to escape the charge of inoperativeness. It is obvious that McLean's device is not perfect, and it may be that defendant's device is the better of the two; but if, as I am convinced, McLean was the first to devise a combination of old elements which would come near enough to producing constant pressure nearly atmospheric in a fire box, to effect large savings in fuel, then he is entitled to make subsequent improvers pay tribute to him. The test of operativeness is to ascertain whether the patented device does (even lamely and imperfectly) perform the acts claimed for it in the method described and (perhaps) for the reasons given. That the device of McLean meets these requirements is, in my judgment, shown even by the tests of Mr. Whitham. It is not a just criticism to point out the wide difference between maxima and minima of pressure noted during many hours of observation. The true inquiry is whether the device reduced the maximum or raised the minimum speedily, so as upon the whole to produce an approximation to constancy sufficient to produce the economies which are really the test of success. In my judgment Mr. Whitham's evidence shows substantial performance.

There are other defenses suggested by the answer and mentioned in the brief, but as they have not been adverted to in the course of exhaustive oral argument, no comment appears to be necessary.

Complainant may take the usual decree.